IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Jose Rafael Lugo Marcelino and Carmen Abreu Garcia, and the Conjugal Legal Partnership constituted by them, legal parents of the minor R.L.A., acting in their name and on behalf of their daughter; and Jose Americo Languasco Rodriguez y Maribel Rodriguez Jimenez, legal parents of the minor E.R.A.L.R., acting on their behalf and on behalf of their daughter,[1] <br><br> Plaintiffs, <br><br> v. <br><br> America Cruise Ferries, Inc.; John Doe; and ABC Insurance Company, <br><br> Defendants. | Civil No. _____ <br><br> Personal Injury <br><br> Trial by Jury Demanded |

COMPLAINT

TO THE HONORABLE COURT:

COME NOW Plaintiffs, through the undersigned attorney and very respectfully state, allege and pray as follows:

**I.      JURISDICTION AND VENUE**

1.      This Court has jurisdiction to entertain the claims pleaded herein due to the existence of diversity of citizenship between the parties involved, pursuant to 28 U.S.C. 1332.

2.      The amount requested for relief herein exceeds the jurisdictional sum or value of $75,000.00 exclusive of interests and costs pursuant to the requirements of 28 U.S.C. 1332.

---

[1] The minor plaintiffs are identified by their initials due to the public nature of this filing. Nonetheless, we will provide their full names and contact information to the co-defendants during the initial disclosure stage of the case and/or via a motion to restrict if the Court would prefer.

3.      At the time of filing the instant suit, plaintiff and defendants have diverse domiciles.

4.      In addition, the present case involves, inter alia, the Admiralty and Maritime Jurisdiction of this Honorable Court and is hence a claim within the meaning of Fed.R.Civ.P. 9(h).

5.      Admiralty and Maritime Jurisdiction is based upon 28 U.S.C. Section 1331 and 28 U.S.C. Section 1333.

6.      Venue is proper since the location of the incident was approximately two miles west of the entrance of San Juan Harbor, on the navigable waters of the United States, in connection with traditional maritime activity, i.e. the ferrying of passengers and cargo from the Dominican Republic to Puerto Rico, aboard the M/V Caribbean Fantasy.

7.      The instant complaint is filed in the judicial district in which the events or omissions giving rise to the claim occurred.  Hence, venue is proper in this district pursuant to 28 U.S.C. Section 1391 (a)(2) and (b).

8.      Supplemental jurisdiction for state based claims is based upon 28 U.S.C. Section 1333 and 28 U.S.C. Section 1367 (a).

II.     THE PARTIES

9.      At all times hereinafter mentioned, co-plaintiff Jose Rafael Lugo Marcelino and co-plaintiff Carmen Abreu Garcia, and the Conjugal Legal Partnership constituted by them, both of legal age, citizens and residents of the Dominican Republic and legal parents of the minor R.L.A., who was a passenger on the Ferry M/V CARIBBEAN FANTASY at the time of the facts alleged in this complaint.

10.     At all times hereinafter mentioned, co-plaintiff Jose Americo Languasco Rodriguez and co-plaintiff Maribel Rodriguez Jimenez, are both of legal age, citizens and residents of the Dominican Republic, and legal parents of the minor E.R.A.L.R., who was passenger on the Ferry

M/V CARIBBEAN FANTASY at the time of the facts alleged in this complaint.

11.     Co-defendant America Cruise Ferries, Inc. ("Ferries") is and was, at all times relevant hereto, is an existing corporation created and organized under the laws of the Commonwealth of Puerto Rico, with capacity to sue and be sued, who at the time of the facts herein alleged on operated the Ferry M/V CARIBBEAN FANTASY dedicated to carry passengers, and other type of cargo, between Puerto Rico and the Dominican Republic, with its principal place of business in San Juan, Puerto Rico.

12.     Defendant ABC Insurance Company is joined as a defendant inasmuch as it issued one or more insurance policies or agreements that may provide coverage for the damages alleged herein.

13.     Defendants John Doe and Richard Roe are other potentially liable parties sued under fictitious names because their true identities are unknown at this time.

III.    FACTS

14.     Plaintiffs purchased a round-trip ticket for a voyage from the Dominican Republic to San Juan and back to Dominican Republic aboard the M/V CARIBBEAN FANTASY.

15.     On August 16, 2016, Jose Antonio Quiroz, who is the coach for the Dominican volleyball team "Avanzada Juvenil, Inc.," boarded the M/V Caribbean Fantasy for a round trip voyage from the Dominican Republic to Puerto Rico and back, along with assistant coaches Jose Luis Gonzalez, Antonio Carcino and Antonio Montes, and team player Marycruz Angelika Garrido; and also team players and minors co-plaintiffs, R.L.A. and E.R.A.L.R., to play in a volleyball tournament in Puerto Rico.

16.     During the morning hours of August 17, 2016, passengers and appearing co-plaintiffs heard an announcement that a fire had erupted on board which was out of control. Therefore, everyone onboard had to report to the upper deck.

17.     As instructed, passengers and appearing co-plaintiffs proceeded to the upper deck, only to find a scenario of total chaos, where people were screaming, pushing each other and jumping overboard in hysteria.  In the meantime, the fire grew, the toxic smoke became heavier and the temperature kept rising.

18.     Consequently, passengers and appearing co-plaintiffs broke into panic and/or suffered extreme anxiety because they believed that the ferry was going to explode before they could escape the vessel.  In sum, they believed that they were going to die. That scenario lasted almost two (2) hours, and all the while the co-plaintiffs were exposed to and constantly breathing toxic smoke.

19.     Passengers and appearing co-plaintiffs, along with most of the other passengers evacuated the vessel, one by one, via emergency slides. Since that was one of the few methods of evacuation available on the ferry herein question.  Please note, only one passenger could use the slide at a time.  The co-plaintiffs had to wait their turn while constantly inhaling toxic smoke being emitted from the out of control fire.

20.     Further, the emergency slide was not properly inflated which caused the slide to bend, thus the US Coast Guard needed to constantly maneuver their boat in order to keep the slide straight for the people to be able to go down through it.

21.     While the emergency slide had to be maneuvered, passengers and the appearing co-plaintiffs were victims of the toxic smoke. Plaintiffs, suffered a knee injury, loss of hearing, shoulder damage, among others, while going down the slide since the slide bended it caused them to hit hard when they reached the bottom.  Plaintiffs also suffered skin burns and lacerations in different parts of the body due to the friction while going down the slide.  Plaintiffs were rescued by the Puerto Rico Police and the US Coast Guard.  Plaintiffs were transported along with other passengers to a pier in San Juan Bay.  From there, Plaintiffs were taken to a hospital and/or a

medical dispensary to receive medical attention.

**IV.**  NEGLIGENCE, LIABILITY AND SEAWORTHINESS

22.  All previous allegations are herein realleged.

23.  The Ferry was built in 1989 in Japan.

24.  The Ferry's flag is from Panamá.

25.  The Ferry does commercial activities between Dominican Republic and Puerto Rico, including ferrying passengers and cargo transportation.

26.  Between 2011 and 2015, the US Coast Guard found at least 107 security deficiencies, most of the them (approximately 44) related to the fire system.

27.  Some of those deficiencies were related to the faulty operation of the fire screen doors, which usually were not able to be closed and/or were reported as open when, in fact, they were closed.

28.  On October 16, 2014, inspection made by the USCG stated that the "inflatable life rafts used in conjunction with MES shall comply with the requirements of Section 4-2. The life rafts 4, 13,17,18 & 24 were found with the painter lines falling off the life raft line storage pockets."

29.  A January 2015 inspection made by the United States Coast Guard ("USCG") stated that oil fuel lines should be screened or protected in some way to avoid any pry or leakage onto ignition sources.

30.  Specifically, in April 17, 2015, the USCG stated that the "fire screen doors shall be capable of closing at an angle of inclination of up to 3.5 degrees.  The following double leaf doors were found out of sequencing and prevents the doors from closing" and that "all waste receptacles shall be constructed of non-combustible materials. Waste receptacles located on upper deck (open) were found to be plastic."

31.   During the past 36 months, USCG's inspections of the Ferries had led to detentions.

32.   In October, 2015, the Ferry was detained in San Juan for three days by the U.S. Coast Guard for three deficiencies related: fire safety measures (international shore connection); crew certificates (certificates of competency) and ship's certificates and documents (safety manning document).

33.   Other warnings provided by the US Coast Guard were that the fire extinguishers were not working well.

34.   The US Coast Guard found deficiencies on the ceiling sprinklers of the fire system.

35.   Between March and July 2016, the Ferry underwent maintenance work in Europe.

36.   Even though defendants informed the public that they would start operating on July 1, 2016, on that date they were unable to provide ferrying service to passengers since the Ferry was still undergoing maintenance in Europe.

37.   In July 2016, while refueling the Ferry at Port of Gibraltar, prior to continuing across the Atlantic to Puerto Rico, the Ferry was detained for six days for deficiencies related to the auxiliary engines.

38.   After the alleged repairs at the Port of Gibraltar, the Ferry continued its voyage to Puerto Rico.

39.   Once again, during the crossing of the Atlantic, in its voyage to Puerto Rico, the Ferry's engines failed.

40.   The ferry was unable to continue its voyage for approximately one day.

41.   Due to said mechanical failure, the Ferry changed course and docked in Santo Domingo, Dominican Republic.

42.   At Santo Domingo's Port, the Ferry allegedly underwent further repairs to the engine.

43.     Early August, 2016, the Ferry arrived at the Port of San Juan, Puerto Rico.

44.     During the USCG inspection, it was determined that only one of three life rafts was working.

45.     A USCG inspection early on August 2016, found four deficiencies related to fire safety measures and one related to the propulsion and auxiliary machinery.

46.     During the events that unfolded on August 17, 2016, the Ferry's life rafts and sliding were not working properly and/or were not properly installed.

47.     Two of the three life rafts did not work well.

48.     One life raft got stuck while descending.

49.     The second life raft, got stuck while descending to the water and when it finally reached the water its engines failed.

50.     This second life raft, was rescued by another vessel and/or vessels.

51.     During the voyage from Santo Domingo to San Juan, and while Plaintiffs were onboard the Ferry, the air conditioner was not working well and/or was not working at all.

52.     This was an indication of mechanical and/or electrical failure.

53.     Due to information and/or belief, the Fire started at 7:15 am at the Ferry's machinery room.

54.     The fire at the Ferry started when the Ferry was near the Thermoelectric Plant located in Levittown, PR.

55.     Defendants lack of repair and/or failure to provide proper maintenance to the Ferry and/or failure to properly and immediately repair the deficiencies informed by the USCG on their report dated August 17, 2016, among others, provoked the fire inside the Ferry.

56.     Plaintiff's damages were a direct consequence of defendants' negligence by: (i) failing to provide a safe ferry; (ii) failing to protect the passengers; (iii) failing to maintain safe premises;

(iv) failing to provide adequate emergency instructions; (v) failing to hire adequate personnel which were not well trained and/or had lack of knowledge on emergency proceedings and/or had lack of knowledge on descending life rafts; (vi) failing to repair and/or properly repair the engine, electric and/or propulsion defects; (vii) Defendants knew or should have known of the Ferry's mechanical, electrical and/or propulsion defects and did not repair them and/or failed to properly repair them; (viii)  Defendants' breached their duty of care to Plaintiffs to the extent they failed to properly maintain properly working the life rafts and other safety equipment; (ix) Defendants provoked Plaintiffs unnecessary delay in the evacuation from the Ferry; (x) failing to cancel the voyage despite knowing that the vessel was not properly working; (xi) the Ferry was operated knowing was unseaworthy due to the defective engines, life rafts, electricity, air conditioners, emergency equipment and procedures.

57.     Due to the abovementioned, defendants failed to comply with the general maritime and admiralty law of the United States and with the Art. 1802 and 1803 of the PR Civil Code.

58.     Defendants actions and omissions, through fault and/or negligence, caused damages to Plaintiff, in violation of Art. 1802 and 1803 of the PR Civil Code and General Maritime Law entitling plaintiff to damages caused as a result of those acts and omissions.

59.     Defendants are jointly liable against Plaintiffs.

60.     Defendants' negligence and/or intentional acts were a proximate legal cause of Plaintiff's injury.

61.     On the other hand, as previously mentioned, Plaintiffs bought the tickets for the voyage departing on August 16, 2016 from Santo Domingo, Dominican Republic, to Puerto Rico.

62.     Plaintiffs paid the total amount of approximately $300.00.

63.     In view of the fact that Plaintiffs were unable to enjoy the Ferry and the Ferry was unable to reach the Port for which it was hired, Defendants are obligated to reimburse Plaintiffs the total amount of approximately $300.00 each for the ticket.

64.     Defendants maintained an unsafe place for Plaintiffs and exposed them to danger while ferrying passengers with a Ferry with serious engine, electricity and propulsion defects and with defective life rafts, mechanical and technical defects, as abovementioned.

65.     The vessel was unseaworthy and Defendants failed to repair the dangerous situation.

66.     Plaintiffs' injuries occurred as a proximate result of the unsafe and unseaworthy condition of the vessel, which was managed, operated and/or maintained by Defendants. In addition, said injuries were caused in whole, as a proximate result of negligence on the part of the Defendants, its agents, servants and/or employees.

V.     DAMAGES

67.     Among the physical and psychological damages suffered by co-plaintiff, R.L.A. as a result of the events alleged in this complaint are:

A.     Smoke inhalation; and constant headaches due to the long exposure to carbon monoxide during the onboard fire, nausea and vomiting;

B.     Injuries through their body suffered during the emergency evacuation process, including but not limited to the following: (1) the ring finger on her right hand suffered an open wound and the skin was burnt during her slide to the US Coast Guard rescuing boat; (2) she suffered blows and scrapes on both her right elbow and her right hand; (3) she also suffered blows on her left shoulder; (4) her right arm was injured and she endured profound pain, the arm was duly bandaged; (5) she also suffered damage to her left arm muscles and ligaments which was so deep and the pain so extreme that she's unable to raise it without feeling profound pain and

discomfort; and (6) she also suffered multiple blows to the back which was covered with bruises.

C.     Psychological injuries and emotional distress for they are currently being treated due to symptoms compatible with Post Traumatic Stress Disorder, such as anxiety, nightmares, insomnia, lack of appetite, dizziness, shock, and nervous trauma;

D.     She has suffered severe psychological damages, which have hampered her physical, emotional, and psychological conditions;

E.     After the fire on the ferry and the injuries suffered by the minor during said accident, the minor was unable to play any more volleyball; and

F.     Jose Rafael Lugo Marcelino and Carmen Abreu Gacia, as legal parents of co-plaintiff R.L.A., suffered extreme and continuous mental anguish and suffering due to the uncertainty of their daughter's safety during and after the ferry's onboard fire that was published by the news.

68.     Among the physical and psychological damages suffered by co- plaintiff E.R.A.L.R. as a result of the events alleged in this complaint are:

A.     Smoke inhalation; and constant headaches and breathing problems and throat pain due to the long exposure to carbon monoxide during the onboard fire, nausea and vomiting;

B.     Injuries through her body suffered during the emergency evacuation process, including a broken tooth, injuries to the left leg generally and to her knee in specific, torn ligaments and a meniscus tear, which translates to constant pain which prevents her from practicing any sport.

C.     In addition, she has suffered loss of hearing which might possibly require her to use hearing aid;

D.     Psychological injuries and emotional distress for which she is currently being

treated due to symptoms compatible with Post Traumatic Stress Disorder, such as sadness, anxiety, nightmares, insomnia, nightmares shock, and fear of the sea and boats, among others;

E.    She has suffered severe psychological damages, which have hampered her physical, emotional, and psychological conditions;

F.    After the fire on the ferry and the injuries suffered by the minor during said accident, the minor was unable to play any more volleyball; and

G.    Jose Americo Languasco Rodriguez y Maribel Rodriguez Jimenez, as legal parents of co-plaintiff E.R.A.L.R. suffered extreme and continuous mental anguish and suffering due to the uncertainty of their daughter's safety during and after the ferry's onboard fire that was published by the news.

69.    In all, because of defendants' negligence, E.R.A.L.R. suffered serious damages that required invasive surgical intervention and therefore are estimated in a sum not less than $1,000,000.00.

70.    In all, because of defendants' negligence, R.L.A. suffered serious damages and therefore are estimated in a sum not less than $1,000,000.00.

71.    In all, because of defendants' negligence, Jose Rafael Lugo Marcelino and Carmen Abreu Garcia, and the Conjugal Legal Partnership constituted by them, legal parents of the minor R.L.A., suffered serious damages and therefore are estimated in a sum not less than $300,000.00.

72.    In all, because of defendants' negligence, Jose Americo Languasco Rodriguez y Maribel Rodriguez Jimenez, legal parents of the minor E.R.A.L.R., suffered serious damages and therefore are estimated in a sum not less than $300,000.00.

VI.    JURY DEMAND

73.    Plaintiffs demand trial by jury on all issues so triable.

WHEREFORE, Plaintiffs prays that judgment be entered in their favor and against all Defendants, jointly and severally, known and unknown, in the amount of not less than $2,600,000.00, as well as costs incurred, reasonable attorney's fees, and such other and further relief as may seem just and proper to this Honorable Court, under the circumstances described herein.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this this 27th day of October, 2016.

s/Enrique A. Baez
ENRIQUE A. BAEZ
USDC No. 214909
1457 Humacao St. Apt. B-1
San Juan, P.R. 00909
Cel. (787) 548-1096
Fax: not available
Email: baez_law@yahoo.com